UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| RUBY JEAN DELOACH, | No. ED CV 14-2185-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on October 28, 2014, seeking review of the Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on November 25, 2014, and December 1, 2014. Pursuant to the Court's Order, the parties filed a Joint Stipulation on May 26, 2015, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

**II.**

## BACKGROUND

Plaintiff was born on December 25, 1958. [Administrative Record ("AR") at 41, 247, 251.] She has past relevant work experience as a human resources assistant, cosmetologist, and teacher's assistant. [AR at 41, 86.]

On February 9, 2012, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that she has been unable to work since April 15, 2010.[1] [AR at 28, 247-56.] After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 28, 218-19.] A hearing was held on March 7, 2013, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [AR at 47-90.] A vocational expert ("VE") also testified. [AR at 84-89.] On March 27, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from April 15, 2010, the alleged onset date, through March 27, 2013, the date of the decision. [AR at 28-43.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 24.] When the Appeals Council denied plaintiff's request for review on July 25, 2014 [AR at 7-12], the ALJ's decision became the final decision of the Commissioner.[2] See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

/

/

/

## III.

---

[1] On April 14, 2010, plaintiff was found to be not disabled based on her prior applications for a period of disability and DIB, and for SSI payments, filed on March 26, 2008, and February 12, 2009, respectively. [AR at 28, 111-19.] The ALJ in the current action found that the 2010 decision had no res judicata effect with respect to the non-adjudicated period because of a showing of changed circumstances, and new and material evidence relating to the issue of disability. [AR at 28.]

[2] The Appeals Council indicated that it had received Exhibit B8F, "Medical Records from Southwest Healthcare System," and made it a part of the record. [AR at 12.] However, it appears that the exhibit is actually Exhibit B7F, which includes medical records from Southwest Healthcare System that were sent to the Appeals Council by plaintiff's representative on July 10, 2013. [AR at 466-69.] There is no Exhibit B8F in the record.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.   THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996. In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

/

/

/

4

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 15, 2010, the alleged onset date.[3] [AR at 31.] At step two, the ALJ concluded that plaintiff has the severe impairments of degenerative joint disease of the bilateral knees; degenerative disc disease of the lumbar spine; and mood disorder, not otherwise specified. [Id.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings. [AR at 32.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[4] to perform less than the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c),[5] as follows:

> [Plaintiff] can lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; [plaintiff] can stand and/or walk six hours in an eight-hour workday; [plaintiff] can sit six hours in an eight-hour workday; [plaintiff] can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; [plaintiff] can frequently balance, stoop, kneel, crouch, and crawl; [plaintiff] must avoid concentrated exposure to vibration and hazards; [plaintiff] must avoid even moderate exposure to pulmonary irritants; and [plaintiff] is limited to simple, repetitive tasks in a non-public environment.

[AR at 34.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of her past relevant work as a human resources assistant, cosmetologist, or teacher's assistant. [AR at 41, 86.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "packager" (Dictionary of Occupational Titles ("DOT") No. 920.587-018), "assembler" (DOT No. 709.684-014),

---

[3]   The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. [AR at 31.]

[4]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[5]   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

and "dining room attendant" (DOT No. 311.677-018). [AR at 41-42, 86-87.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of April 15, 2010, through March 27, 2013, the date of the decision. [AR at 42.]

## V.
## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she rejected plaintiff's testimony, specifically as to her hand limitations. [Joint Stipulation ("JS") at 5.]

As set forth below, the Court respectfully disagrees with plaintiff and affirms the decision of the ALJ.

**A.  CREDIBILITY**

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's testimony regarding her ability to use her hands to engage in fine and gross manipulation. [JS at 5-12, 19-20.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003). Factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. See Thomas v.

Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); 20 C.F.R. §§ 404.1529(c), 416.929(c).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not find "affirmative evidence" of malingering [see generally AR at 34-41], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing. Burrell v. Colvin, 725 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id. at 1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted). The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

Here, the ALJ found plaintiff's subjective symptom testimony "not entirely credible" for the following reasons:

> Although [plaintiff] has received treatment for her allegedly disabling physical treatment [sic], [plaintiff] has not generally received the type of medical treatment one would expect for a totally disabled individual. The treatment has been essentially sporadic and conservative in nature with medication management. The lack of more aggressive treatment suggests her symptoms and limitations were not as severe as she alleged. Further, the clinical and diagnostic studies show only mild findings, which diminish the credibility of the allegations regarding the severity of her symptoms because they are greater than expected in light of this objective evidence.
>
> Further, the record includes evidence strongly suggesting that [plaintiff] has exaggerated symptoms and limitations. Particularly, at the consultative examination, the physician described [plaintiff]'s neurological examination as bizarre, inconsistent, and unreliable, which suggests [plaintiff] may have attempted to portray limitations that are not actually present in order to increase the chance of obtaining benefits.
>
> In addition, the records reflect a history of [plaintiff] being non-compliant with her medications and treatment recommendations. This demonstrates a possible unwillingness to do that which is necessary to improve her condition or may be an

> indication that her symptoms are not as severe as she purports.
>
> [Plaintiff] admitted she received unemployment compensation during the relevant period at issue. This required [plaintiff] to certify she was willing and able to engage in work activity, which is inconsistent with a claimant [sic] for disability. In addition, she stated she looked for work, but she was not qualified for many of the jobs. [Plaintiff]'s inability to secure a job could be due to many factors unrelated to an alleged disability, including possibly a lack of motivation to work or poor economic times nationwide. The inability to secure employment is not the same as the inability to perform basic work activities if hired.
>
> [Plaintiff] has described activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. At the hearing, she said she does not do household chores on a regular basis because she does not push herself, but she does her own laundry, she goes grocery shopping, and she goes to church. In addition, she testified she occasionally volunteers to sit with the elderly so she has something to do. Further, at the consultative examination on April 24, 2012, she reported living alone and doing her own cooking, cleaning, shopping, and laundry, and she came to the appointment via bus. It appears that despite her impairment, she has engaged in a somewhat normal level of daily activity and interaction. The physical and mental capabilities requisite to performing many of the tasks described above as well as the social interactions replicate those necessary for obtaining and maintaining employment.
>
> Lastly, given [plaintiff]'s allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on [plaintiff] by a treating doctor. Yet a review of the record in this case reveals no restrictions recommended by a treating doctor. Moreover, the record does not contain any opinions from physicians indicating that [plaintiff] is disabled or has limitations greater than those determined in this decision.

[AR at 36-37 (citation omitted); see also AR at 38-40.]

### 1.   Sporadic and Conservative Treatment

The ALJ found that plaintiff had "sporadic and conservative" treatment "with medication management," and "[t]he lack of more aggressive treatment suggests her symptoms and limitations were not as severe as she alleged." [AR at 36.]

An ALJ may properly rely on the fact that only routine and conservative treatment has been prescribed. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). "Conservative treatment" has been characterized by the Ninth Circuit as, for example, "treat[ment] with an over-the-counter pain medication" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of

anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain." Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999).

As the ALJ noted, as of June 19, 2010, plaintiff was "not on any medications other than Benedryl, she denied any eye or respiratory problems, and a review of her systems was negative with exception of her history of psoriasis." [AR at 37 (citing AR at 419).] The ALJ also noted [id.] that there was "minimal evidence of medical treatment" around the period of the alleged onset date, revealing "only sporadic visits" to the Rancho Springs emergency room in February, March, May, and June 2010, for the skin conditions of scabies, psoriasis, and atopic dermatitis [AR at 325-65]; a visit to the Arrowhead Regional Medical Center emergency room in January 2011 for knee pain, and right shoulder and elbow pain [AR at 382-83]; and "sporadic" visits to the Arrowhead Regional Medical Center Family Health Center in February, June, August, November, and December 2011, and February 2012, with complaints of hypertension, knee pain, mild neuropathy, back spasms, left-eye vision distortion, psoriasis, and anxiety. [AR at 392-401.]

Evidence of treatment for neuropathy affecting plaintiff's hands is sparse. On August 31, 2011, plaintiff was prescribed Gabapentin after a June 30, 2011, EMG showed evidence of a mild degree of sensorimotor neuropathy in the right upper and right lower extremities. [AR at 373, 395-96.] At plaintiff's next appointment, on November 22, 2011, plaintiff complained of cramping and spasms in the lower back, but had no complaints about her hands. [AR at 398.] At her appointment on December 22, 2011, plaintiff did not want medication for her "[m]usculoskeletal numbness and pain," but wanted "treatment." [AR at 399-400.] Plaintiff testified that she was not given any treatment other than medication "probably because of the insurance."[6] [AR at 63.] She testified that she eventually got ArrowCare medical insurance and was transferred to a new doctor

---

[6] The ALJ noted that there was "no evidence" that plaintiff "sought no or low cost alternatives" while she had an insurance issue. [AR at 35.] In addition, the record indicates that plaintiff was referred to a medical provider for her skin condition during the same time period. [AR at 401.]

9

about three or four months before the hearing.[7] [AR at 61-62.] The new doctor referred her to a rheumatologist, and at the time of the hearing, plaintiff was waiting for an appointment date. [AR at 62.]

The record reflects no other treatment for plaintiff's assessed mild sensorimotor neuropathy. [AR at 373, 395-96.] For instance, there is no evidence that a medical provider recommended treatments such as surgery, physical therapy, a TENS unit, injections, or pain medication for plaintiff's alleged numbness and pain in her hands. See, e.g., Miller v. Astrue, 2009 WL 800227, at *3 (E.D. Cal. Mar. 25, 2009) (ALJ's finding that claimant was not credible properly considered "the conservative nature of [claimant's] treatment" since claimant "was not a surgical candidate, did not use a TENS unit, had not undergone epidural steroid injections and only intermittently took pain medications").

Accordingly, this was a specific, clear and convincing reason to discount plaintiff's credibility.

### 2. Objective Evidence

The ALJ found that the objective medical evidence showing only mild findings was inconsistent with plaintiff's allegations regarding her disabling impairment. [AR at 36-39.] The absence of objective medical evidence to support a plaintiff's subjective complaints is a factor that an ALJ can consider in evaluating symptom testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (finding that while medical evidence alone cannot discredit testimony as to pain, it is one factor that the ALJ is permitted to consider).

At the hearing, plaintiff testified that she has numbness and tingling in her arms and legs [AR at 66], her "hands are killing [her]" [id.], and she could not hold small things "with any accuracy" or grip with either hand. [AR at 78.] The ALJ found that the objective evidence did not support the alleged severity of plaintiff's symptoms. [AR at 40.]

---

[7] The Commissioner represents that beginning in January 2011, plaintiff was able to obtain routine medical care through the Arrowhead Regional Medical Center. [JS at 14 (citing AR at 382-417).]

1   The ALJ specifically discussed the following records [AR at 38]: a June 30, 2011, EMG showing evidence of only a mild degree of sensorimotor neuropathy in the right upper and right lower extremities [AR at 373]; a series of diagnostic imaging studies from March 30, 2012, showing only mild degenerative changes, particularly in the bilateral knees, bilateral hands, and bilateral feet, with no evidence of erosive arthritis [AR at 415-16]; and a consultative examination that showed that plaintiff did not appear to have any difficulty using her right hand or ambulating on her right foot. [AR at 406.] Plaintiff complained to Dr. Eriks at the consultative examination that she had numbness in her right toes and right fingers for the past four to five years, which resulted in not knowing when she picked things up, particularly with her fourth and fifth fingers of her right hand. [AR at 403.] Dr. Eriks found that plaintiff exhibited full range of motion and normal motor strength in her extremities; normal grip strength and motor function in her hands; and no tenderness, warmth, erythema, clubbing, cyanosis, or edema in her extremities. [AR at 405.] Dr. Eriks opined that plaintiff could perform medium work with no manipulative limitations. [AR at 406.]

Plaintiff argues that the EMG showing a mild degree of sensorimotor neuropathy and the imaging studies showing mild degenerative changes actually supports her complaints. [JS at 19.] However, the Court agrees with the ALJ's finding that the objective medical evidence does not support the severity of the symptoms alleged by plaintiff.

Based on the foregoing, the Court concludes that the lack of objective medical evidence, in the circumstances here, was a specific, clear and convincing reason to discount plaintiff's subjective statements.

**3.     Evidence of Exaggeration**

The ALJ found that evidence "strongly suggest[s]" that plaintiff exaggerated her symptoms and limitations, "which suggests [plaintiff] may have attempted to portray limitations that are not actually present in order to increase the chance of obtaining benefits." [AR at 36.]

The ALJ specifically discussed the consultative examination of Dr. Eriks. [AR at 36, 38-39.] During the examination, plaintiff reported that she had numbness in her right fingers for the past

four to five years, and she "does not know when she is picking things up, particularly with her fourth and fifth fingers of her right hand." [AR at 403.] The neurological examination revealed that plaintiff "decline[d] feeling light touch, pinprick, proprioception, or vibratory sense in either her upper or lower extremities . . . from the shoulders to the fingers and the hips to the toes." [AR at 405.] Having found no indication that plaintiff had difficulty using her right hand, Dr. Eriks indicated that plaintiff's "neurologic examination is somewhat bizarre and inconsistent and . . . unreliable." [AR at 406.]

Plaintiff argues that Dr. Eriks did not actually opine that plaintiff was exaggerating. [JS at 19.] While this is true, the ALJ only relied on Dr. Eriks' findings to infer that plaintiff may have exaggerated her symptoms and limitations. [AR at 40 (stating that "[a]t the consultative examination, [plaintiff] appeared to give a poor effort and exaggerate her symptoms, as the examiner remarked that her neurological exam was bizarre and unreliable"); see also AR at 36, 39-40.] This was a specific, clear, and convincing reason for discounting plaintiff's subjective complaints. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ properly found that the claimant's "tendency to exaggerate" was a factor supporting his determination that she was not credible).

### 4. History of Non-Compliance with Medication and Treatment

The ALJ found that plaintiff had a "history" of noncompliance with her medications and treatment recommendations, which "demonstrates a possible unwillingness to do that which is necessary to improve her condition or may be an indication that her symptoms are not as severe as she purports." [AR at 36, 38.] Indeed, at plaintiff's appointment with her provider at Arrowhead Regional Medical Center on December 22, 2011, she brought in five to six full bottles of Gabapentin, saying she was "taking as prescribed," but also indicating that she did not want to take medication. [AR at 400.] The medical provider noted that plaintiff was "very noncompliant" in taking her medication, refused lab tests, and did not want a future appointment. [AR at 399.] In contrast, at the hearing, plaintiff testified that "most of the time" she takes all of her medications, and she does "whatever [her doctors] ask [her] to do." [AR at 72-73.]

An ALJ may consider an "unexplained or inadequately explained" failure to follow a prescribed course of treatment. See Molina, 674 F.3d at 1112; see also id. at 1113-14 ("[Plaintiff]'s failure to assert a good reason for not seeking treatment, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of [plaintiff]'s . . . testimony."). Here, although the ALJ found a "history" of non-compliance with plaintiff's medication and treatment recommendations [AR at 36], the ALJ cited only one record demonstrating non-compliance.[8] [AR at 38 (citing AR at 399-400).] While one *instance* of noncompliance does not display a pattern or the "type of apathy that would suggest that plaintiff's symptoms are not as serious as alleged," Hernandez v. Colvin, 2013 WL 655261, at *5 (C.D. Cal. Feb. 22, 2013),[9] based on the fact that plaintiff brought at least five full bottles of Gabapentin to her appointment with her provider at Arrowhead Regional Medical Center [AR at 400], the ALJ could permissibly infer that plaintiff may not have been taking her prescribed medication for a prolonged period of time. Marci v. Chater, 93 F.3d 540, 543 (9th Cir. 1996) ("[T]he ALJ is entitled to draw inferences logically flowing from the evidence.") (citation and internal quotation marks omitted).

This was a specific, clear, and convincing reason for discounting plaintiff's subjective complaints.

/

/

---

[8] Plaintiff argues that the treatment note after the visit on December 22, 2011, does not indicate non-compliance with medication, and that it is reasonable to infer that non-compliance "was no longer an issue." [JS at 10.] The Court agrees that the referenced treatment note dated February 28, 2012, does not indicate non-compliance with medication. [AR at 401.]

[9] Plaintiff concedes that "if [she] unreasonably refused to take her medications as the ALJ noted, that might cast a shadow on her credibility and motivation to get better." [JS at 10.] However, she argues that "the absence of [records showing noncompliance] speaks more clearly to the failure of her administrative representative or the ALJ to secure the records on her behalf." [Id.] Here, however, the record was neither ambiguous nor inadequate to permit a full and proper evaluation of plaintiff's alleged impairments. Moreover, plaintiff submitted additional treatment records to the Appeals Council, and did not indicate at that time, or at any other time, that there were treatment notes missing from the record. [AR at 466-69.]

### 5. Receipt of Unemployment Benefits and Search for Work

The ALJ discounted plaintiff's credibility because plaintiff received unemployment benefits after the alleged onset date, "which is inconsistent with a claim[] for disability."[10] [AR at 36.] The ALJ also noted that plaintiff's inability to secure a job because she was not "qualified . . . is not the same as the inability to perform basic work activities if hired." [AR at 36.] At the hearing, plaintiff testified that she applied for and received unemployment benefits after she stopped working in June 2010, and while she was on unemployment she continued to look for work. [AR at 52-54.]

The Court acknowledges that a claimant's receipt of unemployment benefits could be a legally sufficient reason to find a claimant not credible if the claimant considered herself capable of work and held herself out as available for work. See Copeland v. Bowen, 861 F.2d 536, 542 (9th Cir. 1988); but see Webb v. Barnhart, 433 F.3d 683, 687-88 (9th Cir. 2005) (rejecting as a basis for finding a claimant not credible the claimant's having held himself out as being able to work during the period of alleged disability). However, a claimant's receipt of unemployment benefits does not necessarily constitute a legally sufficient reason for an adverse credibility determination when the record "does not establish whether [the claimant] held himself out as available for full-time or part-time work." Carmickle, 533 F.3d at 1161-62. The Ninth Circuit recently stated that "*continued* receipt" of unemployment benefits casts doubt on a claim of disability, but the receipt of some unemployment benefits, followed by the subsequent refusal of unemployment benefits, actually supports a claim of disability. Ghanim, 763 F.3d at 1165 (emphasis added).

Here, although the record contains evidence that plaintiff received unemployment benefits after the alleged onset date, the record does not establish whether plaintiff claimed she was available for full-time or part-time work.[11] In addition, the record does not show whether plaintiff ever declined unemployment benefits. Accordingly, the Court finds that the evidence in the record

---

[10] A requirement for unemployment compensation is that the individual be "able to work and available for work that week." Cal. Unemp. Ins. Code § 1253(c).

[11] In California, an individual can receive unemployment benefits if she is available for part-time work. Cal. Unemp. Ins. Code § 1253.8.

that plaintiff was on unemployment did not give rise to a legally sufficient reason on which the ALJ could properly rely in support of her adverse credibility determination. See, e.g., Lind v. Colvin, 2015 WL 1863313, at *4 (C.D. Cal. Apr. 23, 2015); Plummer v. Colvin, 2014 WL 7150682, at *16 (D. Az. Dec. 16, 2014) (claimant's receipt of unemployment benefits was not clear and convincing reason for ALJ's adverse credibility determination where the record did not contain the unemployment benefits application or establish the manner in which claimant held herself out as available for work in completing any such application); Wood v. Colvin, 2014 WL 4407719, at *9 (E.D. Wash. Sept. 8, 2014) (same, where record contained no certification by claimant that he was physically and mentally able to work full-time); Miller v. Colvin, 2014 WL 1873276, at *4 (C.D. Cal. May 9, 2014) (same, where there was no indication whether claimant based her claim for unemployment benefits on full-time or part-time work); Ellis v. Astrue, 2011 WL 5025839, at *5-6 (D. Or. Oct. 20, 2011) (same, where record did not contain claimant's unemployment benefits application).

Regarding plaintiff's search for work, the ALJ noted that plaintiff stated she was not qualified for many of the jobs she sought. [AR at 36 (referring to AR at 53-54).] The ALJ also stated that the "inability to secure employment is not the same as the inability to perform basic work activities if hired." An ALJ may look at a claimant's work record when evaluating her credibility. See Thomas, 278 F.3d at 959 ("when weighing the claimant's credibility," it is proper to look at his or her "work record") (quoting Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)). Here, however, although plaintiff stated that she was looking "for anything . . . Walmart . . . just anything I could think of to try to find some work," it is unclear whether plaintiff was looking for full- or part-time work. [See, e.g., AR at 54.]

Accordingly, plaintiff's receipt of unemployment benefits and her search for work were not specific, clear and convincing reasons to discount plaintiff's credibility.

### 6. Activities of Daily Living

The ALJ discounted plaintiff's credibility based on plaintiff's activities of daily living that were "not limited to the extent one would expect," given plaintiff's complaints. [AR at 36.] The ALJ

noted that plaintiff testified that she does not do household chores on a regular basis, but she does her own laundry, goes grocery shopping, goes to church, and occasionally volunteers to sit with the elderly. [AR at 36, 56, 74.] At the consultative examination, she reported that she lives alone and does her own cooking, cleaning, shopping, and laundry, and came to the appointment on a bus. [AR at 36, 403.]

An ALJ may discredit testimony when plaintiff reports participation in everyday activities indicating capacities that are transferable to a work setting. Molina, 674 F.3d at 1113. However, "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting [plaintiff]'s testimony to the extent that they contradict claims of a totally debilitating impairment." Id. (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1225 (9th Cir. 2010); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009)).

Here, the amount of involvement plaintiff described in her daily activities was minimal [see, e.g., AR at 73-74 (stating that she makes toast or microwaves food, takes "all day or two or three days" to do her laundry because she takes breaks, goes grocery shopping with her roommate and rides in a cart, and "piddle[s] around" doing a few things around the house and then sitting down throughout the day)], and the ALJ does not explain how this level of activity describes a person capable of engaging in even basic work activity or how it is inconsistent with plaintiff's subjective symptom testimony. [AR at 35-40.]

Accordingly, this was not a specific, clear and convincing reason to discount plaintiff's credibility.

**7.    No Greater Restrictions Recommended by a Medical Source**

The ALJ found that the record contains no restrictions recommended by a medical source indicating that plaintiff is disabled or has limitations greater than the RFC [AR at 36-37, 39], and plaintiff points to nothing in the record showing otherwise. Thus, the Court accepts this finding. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (the ALJ properly discounted the claimant's allegations where no doctor "expressed the opinion that [the claimant] was totally disabled" or implied that he "was precluded from *all* work activity") (emphasis in original).

Accordingly, this was a specific, clear and convincing reason to discount plaintiff's credibility.

**B.  CONCLUSION**

In sum, the Court finds that it was error to discount plaintiff's credibility based on plaintiff's receipt of unemployment benefits and search for work, and activities of daily living.  Even assuming the ALJ erroneously relied on these reasons, however, the ALJ's credibility determination must still be upheld if she also provided valid reasons supported by the record that constitute substantial evidence.  Molina, 674 F.3d at 1115.  As discussed above, the ALJ validly relied on plaintiff's noncompliance with medication, sporadic and conservative treatment, the lack of supporting objective evidence, evidence of symptom exaggeration, and the absence of any greater restrictions recommended by a medical source, to discount plaintiff's credibility.  Remand is not warranted.

**VI.**

**ORDER**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for reversal, or in the alternative, remand, is **denied**; and (2) the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: July 1, 2015

                                                  PAUL L. ABRAMS
                                   UNITED STATES MAGISTRATE JUDGE